Good morning. My presentation is very brief. I'd like to reserve at least half of my time for rebuttal. You've got a clock in front of you, and whatever time you've got left when you stop talking, you'll have. Okay. My statement is very simple. I just want to clarify what is and is not before the Court today. The legal issues that are involved are whether the trust funds incorporated into a project agreement, the PSA, have a contractual right to audit an employer who works on those projects, and whether the trust funds must first rely on the union to exhaust a jurisdictional dispute mechanism before they can audit those employers. The procedural issue here is whether the district court erred in blocking discovery. And we're talking about not just either refusing or failing to grant a Rule 56-F motion, but actually blocking discovery on the very issue that it held was material and in ruling and summary judgment on that. Go ahead. Exactly what would the discovery requested have produced that would shed light on whether yours was the appropriate or relevant contract or whether the pipefitters was? The two most important documents that we wanted to get were the certified payrolls, which were actually ready and sitting at the district's office for us, which would have showed who was actually assigned the work, what classifications the employer itself put on that work. And we've shown the few certified payrolls we did manage to get do show labor's classifications, and we believe if we have access to the other ones. Well, I suppose that's somewhat in doubt because the classifications don't leap out at you as being within one contract or the other. Right. You do have to check, and that's why we included those regulations in our apply brief. The classifications used in those certified payroll match the classifications of the laborers' agreement, not the pipefitters'. The prevailing wage rules of the State of California has various classifications based on different collective bargaining agreements. There are classifications for the same work that correspond to the laborers' agreement and different ones with different names and different rates that correspond to the pipefitters'. The ones that we found, the few certified payrolls we found, used the name of the laborers, landscape irrigation laborers, that's the laborers' classification, and the wage rate that's assigned to that, which was, I believe, $27.67 an hour. The pipefitters have a different name. I think they're called landscape tradesmen or something like that, and a different amount. So if we can see those, we'll know which one they're actually assigned to. What difference does it make? The project stabilization agreement gives absolute discretion to the contractor to assign the work. Let's assume that you want to get these records, and I'm looking at them right now, the redacted one says landscape irrigation laborer, $27.67 an hour. So that matches the laborer's contract. So what? What I can understand about your lawsuit and your argument, if the employer or the contractor made the wrong allocation, i.e., to the pipefitters, what difference does it make whether he calls it landscape irrigation labor? What difference does it make if he called it $27? Isn't that a jurisdictional issue? Are you claiming, or have I missed your argument, are you claiming there actually were laborers from your union on the job that are being disguised and paid, and you want the records to discover that? There were actually, there's no record of anyone being dispatched from either union. These, I assume then, are employees, preexisting employees, that the employer was then obligated to insert in one or the other classification. That's what the certified payroll shows. That's not a jurisdictional issue. I mean, you're the trust, and your job is to collect the money that the employer reserves out of a paycheck so that you can get the benefits and allocate it to your members, right? Correct. And your lawsuit was for an audit, and the audit is coterminous with the discovery. In other words, once you get the discovery, you got the audit. So why have a lawsuit if you're going to have the discovery and the audit? We haven't determined whether or not you should have the lawsuit, and the court made a determination there was no jurisdiction. So if we give you the discovery, you got the audit. It doesn't really matter. So the merits of the lawsuit have been resolved by the discovery. So don't you have to go back and see, is this really something that you have jurisdiction over? And I still can't get off the fact that you're arguing about what persons did the job versus where's the money that you owe me. It's not a jurisdictional issue. Jurisdictional disputes are only prospective, who will do the work. We're talking about work that was already done, and we're trying to find the facts of who was assigned the work and which is the appropriate funds for that work. Did you put any – I'm going to go back to my memory. This was on summary judgment by agreement after 12B6, right? We had effectively cross motions for summary judgment. Yes, right. Now, did you put anything in the record that would indicate that somehow it would indicate that the employer, the contractor in this case, was misassigning work, that is he was actually assigning work to laborers, so that your members had money that was sitting in the employer's possession that should be coming to you? That would be the certified payroll. I know, but did you put anything in the record that would indicate the certified payroll? In other words, did you have a laborer come up and say, oh, yeah, I belong to the union and he paid me, but he's not paying me any benefits that are going to my union. All we know is you're just going on a fishing expedition because there's no evidence that I can see in the summary judgment that says you actually are looking for something you might be entitled to. Again, it's the certified payroll. We're going in circles. Sure, it's a certified payroll, but you can't get through a certified payroll and find out all this company business and find nothing because you've not proved that you're entitled to look at those records. The certified payroll shows who was assigned the work, and that's what we're looking for. The record before the district judges, I understand it was a declaration by the employer who says, under the contract I have the absolute discretion and I assigned all the work to the pipe fitters, and I don't see that that was rebutted. I don't think in the motion for summary judgment. It might help me with that. Again, that was rebutted by the certified payroll, and what we're contending is we don't have to show that. The operative agreement is the project stabilization agreement. That incorporates all of the trust funds, all of the different trust funds in those Schedules A's. Each one of them has a contractual right to audit. Whether they will find contributions is a different issue that we never were able to get at. So we're contending we don't have to show who was assigned the work. We don't have to show which was appropriate. That's the same thing that this Court already said. We don't have to show in order to get an audit in the single union situation. We don't have to prove that there are some contributions due. We just have to prove there is a contract that requires that. If the machine gets your discovery, what would you have then? We would have what I suspect we'll find, a certified payroll showing these classifications assigned to laborers' classifications and no evidence of benefits being paid to any trust funds, at least in this audit period. Okay, so you have that now. What do you do with it? We would say the employer itself assigned the work to the laborers in the certified payroll. That's the assignment, and he didn't pay contributions to any funds, so those contributions are due to the laborers' fund. You're actually saying that members of your union are being secreted over here by the employer and being put on the job, and he's not deducting the benefits? No. Well, that's what you said. No, it has nothing to do with membership. It has nothing to do with union membership. Laborers is a general term. What laborers are you going to find on the certified payroll? People that were classified in laborers' classifications. It doesn't matter what union they belong to. Even if they're classified, what jurisdiction do you have to go seeking their benefits? Because the project agreement says that contributions will be paid to the appropriate fund, and so there's a factual issue and a contract interpretation issue of which is the appropriate fund. We're saying that's resolved by the certified payroll. Even if these laborers don't belong to your union? Union membership as a matter of law cannot be a consideration in that. I have 26 seconds. I might as well just finish up that union membership has nothing to do with it. There's no evidence of who was actually sent from a union hall. The only evidence we have in this situation, what we think is going to be determinative, is a certified payroll. They're required to make classifications in the certified payroll. That's what we want to get, and that's what we think will ultimately prove our case for this contract period. Thank you. May it please the Court. My name is Nate Kowalski, and I represent Martinez Landscape. I think it might be most productive if I turn to the points that were just addressed by the Court to Appellant's Counsel and follow up on those points. The question was asked, what would Discovery have produced that would shed light on an appropriate unit? And I think there's two things that we learned from Appellant's Counsel and from the record. The first is that his response to my ears was speculation about what might be found, that Martinez Landscape was not making contributions at all. Well, the record does not support that whatsoever. Here's the problem that I've got. Martinez put on a declaration which said that he signed up with pipe fitters, and he did that as of October 9, 2002. But work started under the PSA in 2000. So even if you credit the declaration that he signed up with the pipe fitters and that all work after that was done for the pipe fitters, the district court's apparent oversight in not dealing either with the Rule 56F motion or the stay of Discovery seems to me precluded there being any evidence in the record with respect to assignment pre-October 2002 and after January 2000. Judge Rimer, two points in response to that. First of all, with respect to work that occurred between 2000 and 2002, there is no evidence that that work actually came under the PSA because the PSA has monetary thresholds such that very small contracts, either less than $15,000 or less than $25,000, do not even come under the PSA to begin with. So despite the fact that there is payroll that predates the October 2002 date, that does not necessarily show, and there is no work on the PSA started in January 2000, doesn't it? There were jobs being done which I do not believe met the monetary threshold. Well, we don't know that one way or the other. We do not know that one way or the other, which brings me to my second point, which goes to the question of what is an appropriate unit. The way that you determine what is an appropriate unit under the PSA is if a union has a beef with the assignment of work, it has a mechanism to contest that assignment and to go to the plan for resolution of jurisdiction. Well, but it's not contesting at the moment. It's not contesting the assignment so much as it's saying the work was assigned and we need to know whether contributions were made for it. Your Honor, I believe that the record on that point is purely speculative. Well, see, that's the problem with the fact that the district court just ignored the Rule 56-F motion and had stayed discovery. Well, with respect to the Rule 56-F motion, and I see where you're focused on the distinction between pre-October 2002, but if you think about the 56-F as of October 2002 and later, the evidence that supposedly would have been generated from this discovery is beside the point because ultimately, if you go back to the PSA and you look at the operative contract interpretation questions that arise, you immediately get to the point of the assignment is made and the contractor has the sole authority to make the assignment, and then if another union has a dispute with that assignment, then they go up to D.C. and they have their hearing at the plant. Sure, I understand all that, but how from the record can one tell whether and to whom work was assigned prior to October of 2002? I do not think the record is clear on that point, Your Honor, but I would... Well, then that being the case, how can the summary judgment possibly stand? I would submit that you have to go back to the most fundamental aspect of an ERISA lawsuit and ask where is the contract obligation that serves as the predicate to a collection action under ERISA, where you have to start with that rather than speculation that work was done and contributions were not made. Well, I understand, but isn't it a chicken and egg problem because the only way that the trust funds are going to know whether work was assigned and to whom is to look at the certified payroll? Your Honor, I would suggest that to the extent that the laborers had a potential claim that there was a contract and therefore a right to sue under ERISA, that claim accrued as of October 2002. And before that, we're talking about Never Never Land. It simply doesn't matter for purposes of contract interpretation. What does the PSA mean? So what happens if they're walking down the street and stumble upon these records? You know, they don't get a discovery. It's just that your accountant, the client's accountant, just happens to be out there on the street. They find them and they find that during this period of October 2002, there were instances where laborers were assigned to their union, but there was no contribution made. Let's say they have this information. Do you have any recourse? Judge Kaczynski, I would submit that the bargain that the Construction Trades Council struck with the LAUSD is such that the laborer's recourse is to claim that there's a jurisdictional dispute, to take that claim to the plan, and then the plan would have the option of assigning that work in whatever fashion it deemed fit. And then from that point forward, they would then, assuming that the plan was to conclude that this was laborer's work, then the trust fund would be able to go back in to federal court under ERISA. And then it's the statute of limitations issue. What I have presupposed is that there is no jurisdictional dispute. They look over the payroll records and they see these instances where employees are in fact assigned to this union. And so there's no dispute. Nobody argues that the employer has the right to make the assignment. But then it turns out they didn't actually make contributions consistent with their own assignment. Where is the jurisdictional dispute? Both unions agree that the employer did what was entitled to do. It assigned some employees to this union. It assigned other employees to the other union. And both unions are perfectly happy with the assignment. But they say, but where are the contributions? Your Honor, again, in my opinion, the second union in your scenario finds the payroll records, finds that there is a potential claim. At that point, it's incumbent upon them to utilize... When you say potential claim, potential claim of what against whom? Potential claim for collection of delinquent contributions from the employer. But that claim does not accrue under the PSA. Again, we're interpreting this contract. It does not accrue until the second union has invoked the jurisdictional dispute mechanism. Even if in your hypothetical, you've got the smoking gun evidence, there's still no contract. Is this a jurisdictional dispute or is it a dispute on the laborer's assumption? Your client classified workers before October 2002 as laborers, not as pipe fitters. Judge Rimer, we classified them as landscape irrigation laborers. Which it says is a classification that fits laborers, not pipe fitters. Right. That is their position. But there is no doubt in the record that there is a jurisdictional dispute going on. There is a bevy of evidence of both the laborer's representatives and the laborer's trust fund representatives putting pressure on Martinez to allocate. And I can give you numerous examples of that. I understand. I just don't get what that has to do with this case. Well, that shows you what the underlying motivation... It shows you that there was a fight about it, but it doesn't show you what actually happened in the past. We now know somebody knows exactly what happened between January 2000 and October 2002. And so the heart of my question is, without knowledge of that, then wasn't the district court in error in saying as a matter of law this case can go nowhere, having not allowed any discovery? Any? No, Your Honor, because as you know, one of the factors in assessing a Rule 56-F motion... Never mind that. He didn't allow any discovery. Well... Because it was stayed. He stayed it, and then everybody just forgot it. It was stayed because there was a question as to subject matter jurisdiction. When that question came off the table as of the hearing for the motion for summary judgment, all of a sudden the motion to dismiss based on lack of subject matter jurisdiction is converted to a motion for summary judgment. Opposing counsel stipulates to proceed in that manner, and he denies it on the grounds that any discovery would be moot, that it would not be relevant to the underlying contractual interpretation issue. Okay. That's the crux of the decision. Your time is up, but I have one quick question. Under the PSA, your client, the employer, had the absolute discretion to assign the work to whoever he wanted to. Is that correct? That's correct. In the record, where does he make that assertion, and what period does his assignment cover? Now, is that the affidavit of Martha? Your Honor, there is, in the record, we have an affidavit of Martha Martinez, the businessman. There is also correspondence from Sal Martinez, the president of Martinez Landscaping, to Richard Resnick, the administrator for the plan, where Mr. Martinez was frustrated. I can point you to the exhibit if you'd like. Frustrated by the organizing efforts and the pressure he was getting from the laborers. I understand all that. I just wanted your explanation. I think you've given it to me. Thank you. Thank you. Does anybody get to audit the employer's record at all? Absolutely, where there's a contract. And who gets to do it? The trust funds do, but we get to the fundamental question is, where is the contract that enables the ERISA collection action? Without a contract, you cannot sue for collection of delinquent contributions. You can't get an audit. So the union can't just go out there and sue an employer that it wants to put pressure on, where there's no contractual relationship. There's got to be the underlying contract that spawns the right under ERISA to audit, which is very invasive, to collect contributions. And that's why you get back to the PSA. What does it mean? When is the contract realized? When does it go into place? Make it more specific. Who in your client's case would audit those records? The pipefitters. After October. Well, there is no record evidence as to whether the pipefitters audited. I don't know. Certainly that could have happened. They could have gone back to the year 2000. We have no record of that fact. But we do have a record. The work was assigned to the pipefitters. Contributions were made to the pipefitters. And that the laborers, although they disagreed with that assignment, they never invoked the jurisdictional dispute mechanism in the PSA. There's no complete record in the summary judgment papers that would show that there was an absolute assignment made starting January 2000. I do not believe so, Your Honor. But I do not think that that's material to the appeal. So if the pipefitters do an audit, and they are obviously concerned about contributions that were made to laborers assigned to their union, but then they notice that a bunch of others have been assigned to other unions, including the construction laborers, now they're going to be interested to check up and see whether those contributions were made. I mean, they don't have any interest in that. Sure. They may be interested in whether or not the employees, there's a jurisdictional question as to whether the employees should have been assigned to their union. But let's say they say, no, this looks right. We don't have any quarrel with the employer's assignment. And they see a bunch of listings. They wouldn't have any reason to go in and check and see whether those contributions were made to those other unions, would they? To the other unions, no. The trustees of the pipefitters have a fiduciary duty to make sure that all contributions owing to the pipefitters' trust fund have been made. And certainly where there's overlapping jurisdiction between two unions, they would be asserting a right to recover. I think you're repeating my question. Oh, I apologize. Maybe I misled you. I gave you that. I said, of course they're going to check up on any jurisdictional questions. They're going to check up on anything pertaining to their union. That's not the part that interests me. You're just restating the question. The question is, do they have any interest in spending resources auditing whether the contributions were made as to employees assigned to other unions? Only if the pipefitters thought that work that was assigned to another union could have or should have been assigned to them. I've already excluded the jurisdictional dispute. Okay. You're repeating the question again. I'm sorry. Focus on what I'm asking you.  And with respect to work that is clearly outside of the pipefitters' contract, no. Under ERISA, the trustees have no obligation and no right to. No right. And, in fact, they would be wasting their resources in doing it. Absolutely. They own resources to trust fund to be looking at auditing things that don't concern them. So does anybody get to audit those contributions? Yes. Under the PSA, if it came to light or the laborers suspected that assignments were made to laborers, they have the right to invoke the jurisdictional dispute mechanism to get a determination from the plan. And the plan can come back and say, from this point forward or going back until X date, the work is going to be 50% laborers and 50% pipefitters. And then both, you know, the workers and the contributions. Let me go back into the part that I didn't ask you about. I'm assuming no jurisdictional dispute. Everybody agrees that the assignments to the construction workers was fine. Nobody disputes it. Everybody thinks this is perfectly fine. Okay? So I don't want you to talk about jurisdictional disputes. I don't want to hear another word about it. You understand? I got it. Okay. So who audits or how does anybody audit whether work is assigned to construction laborers without any doubt as to the jurisdiction, whether those contributions are in fact made as according to that undisputed assignment. And in your hypothetical, there's no contract with the laborers. Yes. But work is being assigned to them. Right. And contributions are not being paid. You repeat the question? I don't think there is any audit in that. So they could pocket the money. The employer could pocket the money. Boy, I wish the IRS were like that. They can only audit you if they have evidence that you cheat on your taxes. Be great. Well, you have to. Not that any of us would do that. Absolutely not. So what is the answer? I mean, why don't they have a good brief here? They say, look, we want to come in and audit, make sure that, you know, you assigned the work. Fine. We don't dispute that. But how do we know you didn't pocket the money? Am I allowed to use the word jurisdictional dispute in this answer? No. Okay. I don't want to hear the word jurisdictional dispute ever again. They don't have a beef. I would like not to hear it ever again as well, Your Honor. But they don't have a beef. Are you sure of probate work? Probate? Never thought of that. How is probate? I hear it's as exciting as ERISA work. It's exciting as ERISA. Well, I'll have to look into that. But with regard to your question, the reason why they don't have a beef is because this is the framework that their representative negotiated for them. This is the world that they live in. It sets up, you know, it creates a certain dynamic for contractors. It creates a certain remedy for the disaffected. Would you call that a moral hazard? Sort of, you know, the ability to assign something to an account that can never get audited? We call that a moral hazard. To the extent that there is a risk of, you know, some sort of chicanery. Thank you. That is a beef, frankly, in my opinion, that the laborers have with the counsel that negotiated the PSA on their behalf. That's something they negotiate every three years. They can tinker with that if they would like at the bargaining table. Well, your answers have caught me some concern. One last question. What period of time of records does the discovery seek? In other words, what period of time of the records does the discovery seek? And what period of time does the audit seek to audit? Well, it's a simple question. And the answer is from 2000 to October 2002. Because I looked and I can't find it. So I'll go back and look. So you're saying that the audit and the discovery starts with documents of October 2002? Actually, no. And here's why it's not a simple answer. Because if you look at Appellant's opening brief, in that brief, they expressly disavow any claims for contributions after October 2002. So they, as a tactical matter, wanted to focus on the 2000 PSA and they waived any. Given that, does the discovery seek documents for that period and does the audit seek information for that period? For the post-October 2002 period? No, for the pre. For the previous. Yes. It does. Okay. Fine. Okay. Thank you. Is that a medical model? Yes. Your first counsel's answer, he says, too bad, we haven't got a contract. Sounds like a pretty good answer to me. Well. I mean, you know, a contract is something you can always get. So you go and, you know, if you don't think you have enough rights, you go and get a contract. Why is that a perfectly good answer? Well, because there is a contract. It's a project stabilization agreement. That contract encompasses multiple things. It is limited for certain things. And why is it limited to the remedies that contract provides? Okay. Well, first of all, the jurisdictional dispute mechanism is prospective only. That's right. You can use the J word. I use the word. Okay. We'll go back to the PSA itself. I'm not saying this is a remedy that helps you in this particular case. My question is, that contract gives you remedies. Now, you could have more remedies if you had a better contract. But you didn't. You have the contract you have. And the fact that it doesn't give you enough remedies is just too bad. This is what I was saying, you know. People arrange their or settle their rights and obligations by contract. And if you didn't provide for this, why aren't you out of luck? Well, we're saying that contract does give us a remedy. Where? Okay. First of all, the PSA incorporates what they call the Schedule A agreements, which is all the different union agreements and signatory unions, including the laborers, the pipe fitters, the carpenters. There's about 20 of them. Incorporates those. And those agreements, including ours, including the laborers, has a provision allowing an audit. And I'm sure the pipe fitters has the same provision. So those are incorporated into the PSA, and any contractor who steps on the job is subject to all of those. Then the PSA also requires that all work that's covered by that PSA, that benefits have to be paid to some trust funds for all that work. So the question is, given that, how are the different trust funds supposed to determine whether contributions are due? Under Martina's argument, no trust funds can audit. No trust funds could claim contributions because they could always say, no, it wasn't your work, we assigned it to someone else. How do you check that? And, again, we're saying this is just the same situation as a single union agreement, but with just an extra twist. We're not required to show that the work is covered or that contributions are due. If there is a contract which incorporates these audit requirements, as this does, we're allowed to go and audit and see if there are contributions due. Are you seeking the audit or discovery for any period after October 2002? Not now. In the district court we did, and on appeal we have limited it to the period up to the time they signed an agreement with the pipefitters. In the district court, though, you were seeking an audit and discovery for materials starting with January, I guess, 2000 through October 2002. Right. In the district court we're seeking from, I think it was January 2000 up to the present. And now we're just cutting off that last period after they signed. Are you saying the record before the district court would show that there's no union contract with anybody, any of the contracts on Schedule A signed between Martinez and any union from that period, January 2000 through October 2002? Well, I believe Martinez admitted that it worked on PSA projects and was subject to the PSA. I'm saying, but there's no evidence that he was in signatory with any of the unions attached, their agreements which were attached to the PSA. Other than the pipefitters afterwards and the PSA itself, no. And so that means that there's that open period, as Judge Remer pointed out, January 2002 through October 2002 where no one would have a contract to audit. Other than the PSA, that's correct, and that's what we're limiting this to. And that's, in fact, the situation with most of the contractors under the PSA. And so the question is then how do we deal with those contractors? How does anybody find out if they're making contributions to any trust funds if no trust funds are given the right to audit? So we're saying all the trust funds have the contractual right to audit, and then if they find something... Do you complain about to your sponsoring union that they can go put more rights into the PSA? You can't get renegotiated every so often. If you're unhappy with that, there's really an audit gap there. Well, I believe... Amend the PSA, no? I believe the 1999 PSA does support our interpretation. There's a subsequent one in 2003 that the only difference, it more directly incorporates the different trust agreements. The 1999 PSA incorporates the union agreements, which in turn may have their own provisions for trust funds, as ours do, or incorporate the trust agreements. The 2003 PSA directly incorporates the trust agreements. See, that's the problem we're stumbling into, and there's a grievance procedure built in the PSA that we're dealing with here, and it's in broad terms talks about working conditions, wages, and whatever. And it seems if we go with you, we're going to cure the problem with this PSA that you cured with the subsequent PSA by putting the trust part of the agreement, and instead of using a grievance procedure that your union could have to determine whether or not there was appropriate contributions made by the employer, we're going to give you the right to sneak in the back door here, in a way. I mean, I understand your problem, but the contract's bothering me, too. Well, the same would apply under any agreement, because under the Schneider decision, trust funds cannot be required to exhaust any grievance procedure. And this particular procedure, this one extra thing I wanted to point out, that Martinez keeps arguing that we should use, that we need to exhaust as a prerequisite to make this claim, we are not allowed to. That procedure, by its definition, is prospective only, where trust funds are not a party to it, they can't use it, and it says in its own provisions for that procedure that it is not allowed to remedy any past work. I think you've said this a couple of times before. I agree. Thank you. Cases are you'll stand submitted. Thank you. We'll next hear argument in Ramirez v. City of Buena Park. Mr. Ramirez. Thank you.
judges: Brunetti, Kozinski, Rymer